# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### Case No. 1:21-cv-00069

| | | |
|---|---|---|
| **HANNAH R. GREEN,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| v. | ) | **AMENDED COMPLAINT** |
| | ) | (Jury Trial Demanded) |
| **MOOG MUSIC INC.,** | ) | (Verified) |
| **a North Carolina Corporation,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

The Plaintiff, Hannah R Green ("Ms. Green" or, "Plaintiff"), brings this action against the Defendant, Moog Music, Inc. ("Moog", or "the Company"), and hereby alleges as follows:

## NATURE OF THE CASE

1.      This is an action by the plaintiff seeking statutory, compensatory and punitive damages, including emotional distress for the intentional discriminatory acts and practices of Defendant, Moog Music, Inc. ("Moog"). As described below, Moog, a local music manufacturer, treats women and men differently in the workplace with regards to hiring and job promotion, as well as in the assignment of duties, job functions and titles. The plaintiff, Hannah R. Green ("Green"), a female, began to be treated disparately and discriminated against after two new male managers were given control of the Sales Department at Moog in January of 2019.

2.       Ms. Green was hired by Moog in February of 2018. Although Ms. Green excelled at her job and had received no complaints or negative feedback from her employer other than constructive feedback and praise, Moog discriminated against her, including without limitation, by treating her disparately with respect to the terms and conditions of her employment and advancement, and by ultimately terminating her employment, because of her sex. Ms. Green brings claims for gender discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, et seq.

3.       Beginning in January of 2019, Ms. Green complained about the disparate treatment in the all-male sales department through the proper channels and would (up until a week before she was fired) continue to bring instances of misogyny and unfair treatment to the attention of her superiors and the human resources department. Moog, a company of approximately 125 employees and less than 10% female workers at the time, allowed the discrimination to continue, subjecting the plaintiff to further harassment and physical intimidation in the workplace. When a male co-worker who had physically intimidated Ms. Green at a work function was being groomed as Ms. Green's direct supervisor, Ms. Green complained again about this possible promotion, and was fired shortly thereafter.

4.       As described herein, Moog failed to train its employees in Human Resources, ignored Ms. Green's complaints and allowed discriminatory and misogynistic acts and practices to continue, failed to take corrective measures to address the discrimination

in the workplace, and ultimately fired her for a discriminatory purpose and/or in retaliation for bringing the discrimination to the Defendant's attention.

5.      Ms. Green also brings a claim for breach of contract under North Carolina common law, because Moog materially breached the contract entered into on April 23, 2020, wherein Moog agreed to pay the Plaintiff the equivalent of two-month's salary if she would work at Moog from that day until August, 1st, 2020. Ms. Green upheld her end of the bargain, and the plaintiff did not.

6.      Ms. Green also seeks compensation for Negligent Infliction of Emotional Distress by the defendant's failure to take reasonable precautions and remedial measures to protect her from the actions of a co-worker, a person known to have physically assaulted, demeaned and degraded the plaintiff previously, causing her severe emotional distress.

7.      Ms. Green also seeks compensation for Wrongful Discharge based on her termination from employment based on her gender, violations of North Carolina public policy, and unlawful retaliation.

8.      Ms. Green seeks declaratory and injunctive relief, consequential, compensatory, and punitive damages, interest, reasonable attorneys' fees and costs, and all other appropriate legal and equitable relief.

## JURISDICTION AND VENUE

9.      Plaintiff, Hannah R. Green ("Ms. Green", or "Plaintiff"), is a resident of the City of Asheville, Buncombe County, North Carolina.

10.     This Court has jurisdiction over the Plaintiff's Title VII claims, pursuant to 28 U.S.C. § 1331, because the Title VII claim arises out of a statute of the United States. Venue is proper in this judicial district under 42 U.S.C. § 2000e-(f)(3) and 28 U.S.C. § 1391(b)(1) and 1391(b)(2) because Defendant is located in Buncombe County and this District is where a substantial part of the events or omissions giving rise to the cause of action herein occurred.

11.     This Court has supplemental jurisdiction over Ms. Green's claims under the North Carolina common law, and pursuant to 28 U.S.C. § 1367(a), because these claims are so closely related to her Title VII claim that they form part of the same case or controversy under Article III of the United States Constitution.

12.     Defendant Moog Music Inc. ("Moog", or "Defendant") is a North Carolina corporation, with its principal place of business located at 160 Broadway Street, Asheville, NC 28801, engaging in the manufacture and sale of musical instruments.

13.     Moog is a "person" within the meaning of 42 U.S.C. § 2000e(a) and an "employer" within the meaning of 42 U.S.C. § 2000e(b).

14.     On or about April 29th, 2020, the plaintiff, Hannah R. Green, filed a timely charge (EEOC Charge No. 430-2020-01831) with The Equal Employment Opportunity Commission ("EEOC"). In her charge, Green alleged, inter alia, that she had been discriminated against and harassed based on her gender (female) by her supervisors and coworkers, and that she was retaliated against because she engaged in activity protected under Title VII. Plaintiff received a Notice of Rights letter from the EEOC dated December, 17, 2020, in which the EEOC made no determinations.

4

15.     All conditions precedent to the filing of suit have been performed or have occurred.

## FACTUAL ALLEGATIONS

16.     All of the above allegations are incorporated herein as if fully re-alleged. Ms. Green was hired by Moog on or around February 5th 2018. Initially, she was hired as a "Sales Assistant" with a 90-day "Introductory Period". During that initial 90 days, Ms. Green's jobs included those of an assistant in the Sales Department, but also included a growing number of tasks, including assisting other departments at Moog. Throughout her time at Moog, Green's job description and duties would evolve and change as she proved to be an integral part of Moog's success.

17.     From the period of February 5th, 2018 through February of 2019, Plaintiff's direct supervisor was Linda Lafferty ("Lafferty"), who was the Sales Director who ran the Sales Department in that time period. At all times relevant herein, Lafferty was acting within the scope of her employment at Moog. The "Sales Team" throughout that time period was comprised of five males. Other than Lafferty, Green was the only other woman in the department.

18.     Working under Lafferty, Ms. Green's job title never changed from "Sales Assistant", but in that time period Ms. Green's duties and roles included, but were not limited to the following:

a.  Personal assistant to Lafferty.

b.  Serving as the de facto Customer Service Manager and Customer Service department, as Green performed all of the tasks in the area of Customer Service

for Moog, including but not limited to: answering customers' calls and emails regarding customer service issues, as well as fixing delays in shipments. Eventually, in or around the fall of 2019, these duties were assigned to other individuals.

c. Managing the de facto "Order Entry" department, as Green entered all Sales Orders at Moog. As the business expanded in or around January 2019, Green procured, interviewed and trained another individual to assume this role and duties in the creation of an "Order Entry" position.

d. Responsibility for tracking and managing all Sales Orders from the time of entry to the time the product leaves the warehouse in coordination with the Shipping and Operations Departments to ensure Sales Orders are filled and shipped, and to create efficiency in the operations of Moog. In or around November of 2018, another individual was moved into a newly created position of "planner/scheduler" and was trained by Green to perform these duties. After this individual assumed this role, Green continued to act as a liaison between the Sales Department, the Shipping Department, and the Operations Department, as well as with the Senior Planner/Scheduler to ensure that all Sales Orders were entered, processed, and shipped.

e. Ms. Green created and continually developed several "Standard Operating Procedures" (hereinafter, "SOPs") at Moog to encourage predictability, accountability and accuracy in the key operations and processes of the business. These SOPs were intended by Green to create streamlined systems for the

implementation of the Sales Department's process and how it interacted with the other departments and their processes. Many of these SOPs were originated by Green out of necessity in an effort to standardize the processes and operations between the Sales Department, the Operations Department, and the Shipping Department, and to make these connections more efficient. Green also conducted regular internal audits of Sales Orders and data to ensure that the SOPs were being followed and to ensure that the data in the system was accurate.

f. Tracking inventory of Moog instruments within the Sales Department.

g. Managing inventory of Moog merchandise on a company-wide level, including ordering and management of merchandise inventory. In this role, Green worked in tandem with the Purchasing, Finance, and Shipping Departments at Moog on behalf of the Sales and Marketing Departments.

h. Ms. Green was the point of contact at Moog for "special orders", such as those to musical artists or the local elementary school. Ms. Green also was the individual who entered these orders and followed them through until shipment.

i. Event Planner for the Sales Department in charge of planning internal Sales Department events as well as official Moog events for Moog dealers and distributors.

j. Managing twenty-four (24) Sales accounts.

k. Green created, analyzed, and presented weekly sales analytics and sales reports weekly for the Sales Department, including: Sales Reports and potential sales (called, "bookings") reports, numbers for shipments for the week, Month-to-Date

and Year-To-Date numbers for bookings and completed sales, to be used for sales forecasting and the commercial planning process.

l. Assisting the other Sales Team members, which included handling matter such as: answering all phone calls to the Sales Department daily including through lunch hour, sending emails, tracking employee's "day's off", scheduling of flights, hotel stays and dinner reservations, and keeping minutes for the Sales Team Manager's meetings.

19.     Beginning in or around May of 2018, Lafferty began to groom Green for an "Account Manager" position through training and mentoring. On or about July 25, 2018, Lafferty gave twenty-four (24) sales accounts to Green to manage, while Green continued to perform her prior duties as described in the previous paragraph. Green was the account manager for those 24 clients up until February of 2019.

20.     On January 7th 2019, Mike Adams, the President and majority owner of Moog (hereinafter, "Adams"), announced the creation of the "Workplace Experience Department", which is commonly known as a Human Resources Department, of which Lafferty would be the Director and sole member. Upon information and belief, Moog failed to properly train Lafferty for this position.

21.     In that Jan 7th meeting, Lafferty announced that Andrew Stryffeler (hereinafter, "Stryffeler") and Nick Valente (hereinafter, "Valente") would be named as the new Sales Directors for the newly-created Domestic Sales and International Sales Departments, respectively. Stryffeler and Valente had previously held positions of Sales Account Manager in the Sales Department. At all relevant times herein,

8

Stryffeler and Valente were acting within the scope of their employment. Upon information and belief, neither Stryffeler nor Valente received adequate training from Moog in the area of Human Resources and handling of employee complaints.

### Discrimination and Disparate Treatment Begins When Stryffeler and Valente Takeover

22.     After Mr. Stryffeler and Mr. Valente takeover as managers of the Sales Department in January of 2019, Ms. Green, the only female in the department, was treated differently than co-workers who were male, by her superiors and by others within the Moog Sales Department. For example, in their very first Sales Department meeting in which they held the reigns, Stryffeler announced that Green would not be attending the North American Modular Music festival (NAMM[1]) in Los Angeles. Rather, it was announced, that this assignment was being given to Scott Brandon (hereinafter, "Brandon") a male co-worker who had been hired on or around November 4th 2018, as a Sales Assistant. This change occurred within one week of the start of the NAMM event at which Green was scheduled to meet with several of her twenty-four Sales Accounts that she managed. Stryffeler announced that Green would be staying behind as all of the other members of the Sales team attended, including the new male Sales Assistant, Brandon, who had not handled any Sales accounts at that time and had no reason to attend NAMM other than for entertainment. Plaintiff thereafter discussed this disparate treatment with her

---

[1] NAMM is the largest event of its kind in the electronic music industry, which Moog utilizes to network and "put a face on the name" for the Sales Account Managers and their accounts.

supervisor, and upon information and belief, no disciplinary action(s) were taken against Stryffeler.

23.     Further acts of discrimination continued in a Sales Department meeting in February of 2019, wherein Stryffeler abruptly informed the plaintiff that all twenty-four (24) of her Sales Accounts were being taken away and assigned to other male Account Managers. No accounts were taken away from the male members. This occurred despite Green being qualified to continue in that role and handling those accounts proficiently for the previous ten (10) months. Ms. Green was never given a title of "Account Manager" even though she managed twenty-four (24) Sales Accounts. All of the other males who managed Sales Accounts held the title of "Account Manager".

24.     As a result of the meeting and these sudden announcements, the plaintiff experienced emotional distress, in the form of a panic attack. Stryffeler noticed the plaintiff's distress in the hallway after the meeting. The plaintiff indicated that she was upset by the changes, she didn't think it was fair as she had been managing several accounts for the previous ten months, and was effectively demoted in front of the group without warning or explanation. Stryffeler justified Moog's decision by stating, "We thought you'd like to be the "Mom" of the Sales Department."

25.     Shortly after that February of 2019 meeting, the Plaintiff spoke to Lafferty in person (and later confirmed the conversation by email) wherein Green informed Moog of the "Mom" comment, to which Lafferty replied, "Wow, that's sexist!" In addition to reporting the misogynistic statement made by the newly-appointed Domestic Sales

Manager, Green also discussed her unfair and disparate treatment in the all-male Sales Department in person and in written communication with Lafferty. Specifically stating that she was being treated unfairly by the managers, and that her duties that she had performed well were stripped away and given to the other members of the sales department while telling her they "wanted her to be the mom of the department". The plaintiff received no information from Moog in response to her complaints. Upon information and belief, Moog failed to take any remedial action based on Ms. Green's report.

26.     The very next month, in March of 2019, another incident occurred that revealed Moog's practice of treating men and women differently. The Sales Department Managers called Ms. Green into a meeting, where they informed her that Brandon, a male, was being promoted to an International Account Manager position. This promotion was given to Brandon without posting the open position and without an application process, in contravention of written company policy[2]. Brandon, upon information and belief, had no experience in management or managing direct sales accounts prior to joining Moog. This promotion occurred despite Moog knowing that Ms. Green was more qualified for the position, had been with the company longer, had direct account management experience in prior employment positions, and had a stellar record while working at Moog for over a year at that time while managing twenty-four (24) Sales Accounts for Moog. Yet, Ms. Green was denied the position and

---

[2] Moog's Employee-Owner Handbook states that "open positions [within Moog] will be posted internally on the jobs board and announced via email." (See Moog Music, Inc. Employee-Owner Handbook, p. 7).

the opportunity to apply for it. Valente stated that Green's job title and some duties would be changing without a change in salary. Stryffeler added that, for Ms. Green "This would be a faster route to the Account Manager position."

27.     Then, in or around April of 2019, Stryffeler hired another male individual as a Domestic Account Manager, and this individual was also given the position without going through the normal hiring process in violation of Moog's written Company policy. (See Footnote 2) Moog did not post this job opening in public or company listings, denying the plaintiff the opportunity to apply.

28.     Several other incidents of misogyny and discriminatory acts within the Sales Department occurred and were reported to Moog in the relevant time period. For example: In the period from April 2019 through August 2019, Brandon became more and more involved with Green's work, often asserting a managerial role and positions of power over Ms. Green. At times Brandon (who is very tall) would stand behind Ms. Green, looking over her shoulder while she was seated and working, and would comment on how she conducted her duties and tasks, despite having no managerial role over Green. Green reported this conduct to the defendant on more than one occasion in person to her direct supervisor, Valente, reporting that Brandon was trying to be Green's "boss", by, among other things, reviewing her completed work on projects that did not involve Brandon, standing over her while she worked micro-managing her, and commenting on her work in a demeaning manner. Green also reported to Valente that she felt intimidated when Brandon would stand over her and manage her work, and that Brandon was out of line.  Upon information and belief, no

disciplinary action was taken against Brandon or Stryffeller in response to these reports.

29.     Throughout the relevant time period, there were also several incidents where Stryffeler, always unannounced, would publicly strip the Plaintiff of assigned duties and tasks at which Green had been excelling and give them to other male members of the Sales Team who were less qualified. These projects include but are not limited to: the "Event Planner role", the Director of the Merchandise Committee, and The Moog Pro Planning Committee.

30.     Additionally, Brandon and Stryffeller would often take projects and ideas from Ms. Green and present them to the upper management as their own projects and ideas, as if they created them, and would take the credit for them. On more than one occasion when this occurred, those individuals would get public thank-you and praise from Moog in company-wide emails and company-wide "plant meetings", while Green would not. Green reported these incidents to Supervisors and Lafferty, and Moog did nothing.

31.     Instead, Moog allowed Stryffeller and Brandon's actions to continue. In or around August 2019, the plaintiff's work schedule was changed to 8AM-4PM instead of the normal 9AM-5PM. Shortly after this change, Brandon, upon information and belief, began to look over Green's time coming in and out of work and started questioning management as to why Green was leaving at 4PM. This change in working hours was decided on by Valente and Green in order to accommodate mental health counseling that Green undertook to deal with the anxiety and stress caused

by her unfair treatment at Moog. Green, who was almost always early for work, was late one day, arriving at 8:05AM. Valente relayed to Green in a one-on-one meeting that "certain people in the department" were concerned about Green's hours and it was "creating an upset", and so they were changing Green's hours back to 9AM-5PM. Upon information and belief, Brandon's complaints were more important that Ms. Green's mental health.

32.     On August 13th, 2019, Valente and Brandon returned from a work trip to Japan. Ms. Green and Brandon had a conversation that day wherein the following misogynistic, offensive and discriminatory statements were made as Brandon described his discussions with Valente about Green: Brandon stated, that he and Valente discussed Green's "future at Moog" while they were in Japan. Brandon stated to Green (purporting to speak for the Sales Department) that "they weren't sure that you can be on a plane for 5 hours, find your way around a new city, and get to your hotel," "And if you have a nightmare or something, you can't just not show up for your meeting that day or call and put it off." He also stated, "What happens if one of these guys (the distributors) is an asshole to you and you have a panic attack? You can't just freak out!" "Can you even travel? I mean you have kids and a family. Did you ever think about that?" These statements and the interaction were reported to the defendant in writing and in person (Lafferty) specifically discussing how misogynist and sexist this was and her concern about the Management. The Plaintiff received no response from Moog, and upon information and belief, no remedial action was taken in response to these complaints.

## Brandon Verbally and Physically Intimidates Green
## at a Work Function

33.     On September 17th, 2019, Brandon verbally berated and physically intimidated Ms. Green at a work event called "Moog Pro[3]". The interaction included Brandon physically putting his hand on Ms. Green in an aggressive manner while sitting across a small table screaming at her. This aggressive and unwanted physical touching occurred during a confrontation that lasted approximately one hour, in which Brandon was loudly berating Ms. Green about what time she clocked-in and out of work. Brandon's aggressive rant included statements that Green was a "fucking liar" (regarding Green coming to work on time even though Brandon reported to work an hour after Green daily and was not in a position to observe when Green came to work) and that she would "never move up in the Sales Department". Sometimes standing over Green and screaming, Brandon continued to berate Ms. Green for approximately thirty (30) minutes despite Green repeatedly asking him to stop. In this conversation, Brandon also told her that (according to information Brandon received from Valente) one of the reasons Green would never get an International Sales Manager position because she "isn't bilingual". Brandon, who was then an International Sales Manager, is not bilingual. After Green had broken into tears, she asked Brandon "Why are you doing this?" To which, he replied, "Oh, so I

---

[3] Moog Pro 2109 was a product-training event that was planned and organized by the plaintiff for Moog's clients, in which Green led two of the live trainings for the attendees. The incident recited in this paragraph occurred during one of the planned social events for Moog Pro in which most of the clients who were present were clients with whom the plaintiff had contact on almost a daily basis. This event was another chance for clients to put a face-to-a-face with their Moog representatives.

guess it's my fault because I'm a man!" This entire confrontation went on for about approximately one hour until Green stated again that she was at work on time on a day Brandon said she wasn't, and Brandon violently slammed his hands on the small table in between them and screamed, "No! You were not! You're a fucking liar!" Ms. Green left feeling bullied, harassed, and belittled, and suffering emotional distress.

34.    The next morning, in accordance with company policy, the plaintiff notified Valente of Brandon's hostile and aggressive behavior in detail in an email and requested to speak with Valente. Later that day, all of the other members of the Sales Department, including Brandon, attended a social event that Green coordinated for the Moog Pro event, while Green was directed to stay behind in the office. This decision was made despite none of Brandon's clients attending MoogPro that year, while over half of the attendees were from the accounts with which Green worked. That afternoon, Green relayed the entire incident to Lafferty. At that meeting, Lafferty made the comment that if they "hear that one of those clients saw [Brandon] yelling at me" then "he would be fired immediately." Lafferty stated that she would look into it.

35.    A meeting was held on September 24th, 2019, wherein Ms. Green, Lafferty, Valente, and Brandon all meet in the conference room. The misogynistic comments, the intimidation and the violent incident was discussed. As Green described the incident, and how she was afraid of Brandon, and relaying how Brandon was slamming his hands on the table, standing over her and screaming while she cried, Green was immediately cut off by Valente, who stated, "Hannah, if you think this is

16

some sort of court of law, you are sadly mistaken." Brandon was then given an agreement, which Green understood to be a "Counseling and Performance Improvement Plan", (as mentioned on page 29 of Moog's Employee Handbook). Brandon and Green signed a document and Brandon was directed to agree to:

     a.  work from home for the rest of the week,

     b.  move his desk away from Green's when he returned,

     c.  not exhibit violent, harassing, or controlling behavior towards Green,

     d.  not exhibit controlling behavior over Green's projects that did not involve him, and

     e.  not to act as Green's "manager" or assert any authority over Green in the workplace.

36.     Immediately following this meeting, Brandon went back to his desk that was directly next to Green's where Ms. Green was sitting. As he aggressively packed his things to leave, he made loud noises and was throwing pens, and other desk items, as well as his aluminum water bottle, in frustration. The plaintiff again suffered emotional distress and experienced a panic attack as a result of Brandon's aggressive and intimidating actions in such close physical proximity to her.

37.     The tantrum described in the preceding paragraph was reported in person to Lafferty in October, 2019, when Lafferty, checked back in with Green and her interactions with Brandon following the incident. In that conversation, the plaintiff reported that Brandon did not move his desk away from Green, but rather only moved

his desk from six feet to her side to a spot six feet behind her. Green stated to Lafferty that this made her feel uncomfortable and caused her distress, despite no other incidents with Brandon at that time. Upon information and belief, nothing was done as a result of this report, despite being a violation of the agreement signed in September. No other "status discussions" were had with Lafferty nor Valente, in violation of Moog's company policy (page 29), and, upon information and belief, Brandon received no discipline and nothing else was done by Moog in response to this report to change its policies and practices.

## Restructuring at Moog and the Creation of the Sales Operations Department

38. In or around October, 2019, Joe Richardson (hereinafter, "Richardson) was hired by Moog as the new Chief Marketing Officer (CMO) of Moog Music. The Sales Department at Moog reports to Richardson. Shortly thereafter, Valente was promoted to Vice President of Moog Music. This change would necessitate a restructuring of the Sales Department. At all relevant times herein, Richardson was acting within the scope of his employment.

39. On several occasions, in the period from October of 2019 and continuing into March of 2020, Valente and Green met and discussed Green's job and Green's future role at Moog, among other things. During these conversations, Valente revealed "upper management's" decision to create a new department at Moog to accommodate the recent expansion. Valente stated that this department was aimed at increasing communication and efficiency between Sales and Marketing, between Sales and Finance, between Sales and Production, between Sales and Shipping, and between

18

Sales and the Executive team, in an effort to standardize and streamline those departments' interactions with each other. Valente informed Green that the new "Sales Operations Department" needed a manager, and that person would be working "on the same level with Stryffeler". This individual would have authority to act for the Sales Department in each of the interactions between departments mentioned above. Valente explained to Green that the duties of the new position consisted of, among other things, all of those duties that Green already did and would also include a few of the tasks and duties for which Stryffeler was responsible at that time. The role, as Valente explained, would include being the point person between the Domestic Sales Team and the International Sales Team. Valente informed Green that this position would be a "step-up" from where Green was at the time, and a "Natural progression for [Green]" Valente asked if Green would be interested in that position and Green responded that "of course she was interested" as the duties of the new position included all of her present duties but included more authority to get things done. Valente informed Green to inform Stryffeler and Richardson of her intent, which Green did.

40. No individual in the Sales Department was more qualified to fill the position referenced in the preceding paragraph than the plaintiff, nor did any of those individuals have as much direct experience with the specific tasks and duties that the position would entail.

41. In or around December of 2019, Moog again displayed disparate treatment in its hiring practices and discrimination based on gender when it hired a male

Assistant to the Artist Relations Department Head without posting this position or notifying the employees, in violation of written Company Policy (See Footnote 2). This exact position was first proposed by Green in conjunction with the Artist Relations person, in Green's attempt to get out of the Sales Department at Moog, and the request was denied. Green discussed this possibility with Lafferty as a way to "get out of the Sales Department", and was told that if that position became available, "it will be posted and you could apply", which never happened.

42.     In the end of January of 2020, Green and Valente met to discuss Ms. Green's position at Moog in light of Valente's recent promotion and the announced restructuring of the Company. Valente and Green discussed that Ms. Green was to train a new employee, Doom Christ (Christ), and hand off some of her accounts and duties to him in his new position of "Sales Operations Europe". Valente informed Green that the new Sales Operations Department would be made up of two or three individuals, and would be assuming all of the logistical, analytic and administrative duties from the Sales department, "to allow them to focus on sales". Valente stated that this new department would need a Manager. Since the date she was hired and up until this point, Ms. Green handled nearly all of the logistical, analytic and administrative duties in the Sales Department. Green stated that she was interested in the Sales Operations Manager position, in response, Valente asked if Green "was willing to meet with Joe (Richardson, Chief Marketing Officer at Moog)", to "talk about what she did in Sales Operations".

43.      At Valente's request, Green met with Richardson in January of 2020, and then again two more times in the period from January to March of 2020.

## The Creation of the so-called "Sales Operations Department"

44.      In her first meeting with Richardson in January of 2020, Richardson informed Green of the creation of the new Sales Operations department. He explained that and Moog was developing this department with plans to have two or three individuals in that department, including a "Sales Operations Manager, to oversee the department". Green informed Richardson that she certainly was interested in the position, as the position they discussed mainly consisted of tasks and duties that solely Green performed for Moog. In that meeting, Richardson asked Green for a "run-down of everything that Green did from the time a purchase order is received to the time the instrument leaves the building." After Green downloaded all of her duties in that regard to Richardson while he took notes, he said "WOW! So, we need to get all these little things off your plate so that you can focus on your "new role." And, they scheduled another meeting to discuss "what that new department would look like."

45.      Before their second meeting, another incident occurred with Brandon in January of 2020. While Brandon was present, Adams came into the bullpen and directly asked Green to handle a specific project in the area of Sales Operations. After Green completed the project, Brandon took Green's work and presented it to Adams as his own, outside of the plaintiff's presence.

46.     Upon information and belief, some remedial action was taken against Brandon for one of the incidents described in paragraph 45, as Green was retaliated against by Brandon for reporting these actions.

47.     Brandon, upon information and belief, was called to a meeting with Valente to discuss his actions towards Ms. Green, wherein he was told to "stay in [his] lane". Immediately after this meeting, Brandon returned to the "bullpen[4]" and loudly and aggressively stated, "I guess I'm just gonna stay in my lane!" slamming his body down into his chair where he sat less than six feet away from Ms. Green. Throughout that day, verbal and physical acts of intimidation continued. Whenever anyone would ask Brandon to do anything, he would loudly exclaim, "No! I can't do that! I'm stayin' in my lane!" waving his arms sometimes within a few feet of Ms. Green's head. Later, Brandon exclaimed that he "always had a knife on [him]". The intimidation of Ms. Green continued throughout the day and caused the plaintiff severe emotional distress, and made the plaintiff feel less inclined to report incidents of this type in the future.

48.     Plaintiff reported the actions described in the preceding paragraph to Valente in person at their next regular "one-on-one" meeting in January. Upon information and belief, no remedial action was taken against Brandon for those acts.

49.     Ms. Green and Richardson met a second time in January of 2020. In that meeting, Richardson and Green continued to discuss her daily duties and tasks in sales operations, as well as the systems and procedures that Ms. Green had been

---

[4] The "bullpen at Moog is a singular area where all of the Sales team sits within close proximity of each other. It has a hard plywood floor, chairs with wheels, and no "cubicle dividers".

created, developed and implemented over the previous year to automate her processes. Green raised an idea of a creating an online customer "portal" to automate customer's interaction with Moog, and Richardson indicated that he "had been thinking the same thing". The remainder of the meeting was dedicated to Green communicating the internal and external Standard Operating Procedures ("SOP's") that Green created and implemented and how that would relate to the customer portal that they discussed. Later, Richardson asked Ms. Green to "be available" for a phone call with a company that Richardson was to speak with about this "portal" solution, stating that "[Green] would be the best person to explain our process to them". A third meeting was scheduled for on or around February 17th, of 2020 to continue the development of these systems and processes for the new department.

50.    Simultaneously as these discussions occurred, one other position became available at Moog in another department for which Green was qualified. Although the position would not have been a promotion, it would have taken Ms. Green out of the Sales Department. Green was persuaded not to apply based on statements made by Richardson and Valente regarding the Sales Operations position and Green's ongoing meetings with Richardson.

51.    Towards the end of February, prior to the third scheduled meeting with Richardson, a deadline to apply for the position referenced in the preceding paragraph was approaching and would expire prior to Green's next meeting with Richardson. Green went to Lafferty's office and requested to meet with Richardson before he left for a business trip because she "wanted clarity".

52.     Immediately thereafter, Green, Lafferty and Richardson met in the office of Adams, the President of Moog, who was not present. Green began the conversation by stating that she wanted clarity on some "gossip", she had heard among the Order Entry person and the Domestic Sales Assistant, as those two had discussed what the new Sales Operations Department would look like and who was going to be in it, which was based on those two individuals' discussions with management. Ms. Green relayed that the Order Entry person, whom Green trained, had stated that Stryffeler would not answer the question when asked whether Green would be the new Sales Operations Manager. Ms. Green said it was her understanding that there would be a new department in the area of Sales Operations with a few positions including a manager, which Richardson confirmed.  Green again stated she was seeking clarity on her role, based on this information and the ongoing meetings she had with Richardson and Valente. Richardson confirmed the plans for the upcoming "Sales Operations Department", and stated that "no company of this size is successful without one".

53.     In that meeting, when Green asked Richardson directly about the Sales Operations Manager position, Richardson responded to Green by saying, "I want you to know that I know that you are the Sales Ops person" at Moog, and that "anytime I have a question about Sales Ops, you always have the answer." He further stated that "since I've been here, I have noticed that any time I ask you to perform a Sales Ops-related task, that you knew what you were doing, and you got it done quickly and efficiently".  Richardson stated they were going to "finalize that position and post

it in the next two weeks", to which Lafferty added, that they "would let her know when they posted that position". That position was never posted during the plaintiff's period of employment.

54.     In early March during a Sales Team meeting, Stryffeler presented a new SOP for international accounts to be implemented by Ms. Green, which would ultimately be ineffective and unusable. After three weeks of being unable to translate Stryffeler's suggested process to Moog's international partners successfully, Ms. Green repeatedly spoke up in meetings and directly to Valente about how Stryffeler's SOP needed to be rewritten in order for it to work. Ms. Green referred the management team to the SOP that Green had previously written, developed and utilized successfully for this exact process. Valente then asked Ms. Green to tweak the SOP to accommodate the issues they were facing, which Green did and turned it in to Valente for approval. During the next Sales Team meeting in March, Green submitted the corrected SOP to the team, at which time Stryffeler announced that he and Brandon (who now held the role of Domestic Account Manager) would "review it and make any changes", which they did in a private meeting without input from Green.

55.     The Plaintiff spoke with Lafferty in a phone meeting on or around April 16th, 2020, wherein Ms. Green reported the occurrence in the previous paragraph and the ongoing problem with Stryffeller taking away her tasks, duties and responsibilities without explanation, and giving them to Brandon, among other things. Ms. Green, relayed that this time Stryffeler was specifically re-assigning her duties, tasks and

responsibilities relating to Sales operations and analysis to Brandon, even though Brandon still held the role of Domestic Account Manager – a role that would not include creating or reviewing Ms. Green's SOPs. Green reminded Lafferty of the numerous times Green had complained about Brandon taking over Green's duties. This time it appeared that Stryffeler was giving Green's operations and analysis duties to Brandon. Green informed Lafferty that she was concerned about this because it appeared that Stryffeler was planning to give the Sales Operations Manager position to Brandon without an interview as they had done before, and that not only would that violate the Performance Improvement Plan that Brandon signed and Moog's Company policy, but Ms. Green would not work under Brandon and would "have to quit". Green told Lafferty once again that <u>she was afraid of Brandon</u> and she would be forced to quit her job if that happened. Green also relayed to Lafferty that she had not spoken to anyone else about these concerns and that she was afraid to do so because of the culture in the Sales Department. When discussing the Sales Operations position, Lafferty agreed with Green that "they should have heard something by now," and stated that she "would do some investigating and call [Green] back".

56.    The next communication from Lafferty was an invitation for a phone meeting that occurred on Tuesday, April 21, 2020. In that meeting, Lafferty informed Ms. Green that she had spoken to Valente and Richardson and that they would "all sit down on Thursday and talk if [Green] would come into the office" (at this time, most

of the employees in the Sales Department, including Green, were working from home). Ms. Green agreed and told her "thank you."

57.      On Thursday, April 23, 2020, Ms. Green went into the office and sat down in the conference room with Lafferty. Valente entered and quickly sat down and informed the plaintiff that she was terminated from employment at Moog. Valente stated that Moog was "dissolving her position". Green began to ask "what about the Sales Operations department," when Valente interrupted Green stating, "That's not happening." Upon information and belief, this statement was false. Green was then asked to stay until August 1st, 2020, in order to train others on her duties. Valente stated that, "if you stay until August 1st, I will hand you a check on that day for two-months' severance pay" - an amount that would equal $6,538.48. The plaintiff agreed, as she expected to work from home for the rest of that time and would not be around Brandon. Lafferty stated that, "if any new positions become available, she would let [Green] know." And Valente added that "if they decided to move forward with the Sales Ops thing, they would let [her] know as well."

58.      The plaintiff accepted the offer and performed under the contract recited in the preceding paragraph by successfully completing the employment period at Moog up to August 1st, 2020.  Thereafter, Moog breached the employment contract discussed in paragraph 57 by refusing to pay the plaintiff the promised two-month's salary.

59.      In the period between April 23rd, 2020 and August 1st, 2020, the plaintiff continued her duties in fulfillment of the agreement of April 23rd. During that time,

Green, among other duties and tasks, trained the Berlin Sales Operations person and others for their new duties as she continued to function in her roles.

60.     On April 28th, 2020, the plaintiff emailed Adams, the President of Moog directly. In her email, Ms. Green, *inter alia*, informed Adams directly and specifically of some of the misogyny, discrimination and unfair treatment that she had endured and continued to endure, thinking that perhaps he hadn't been informed and requesting that Moog take remedial action. Ms. Green also informed Adams in that email that she would be filing a complaint/charge with the EEOC if he didn't make changes and address Ms. Green's continued complaints. The Plaintiff received no response from Adams, other than him stating that he was sending it on to Lafferty.

61.     After, and in response to this written letter to Mike Adams, Lafferty attempted to create the appearance of some kind of investigation. Lafferty asked the plaintiff for a face-to-face meeting on ZOOM (an online video conferencing program). At the time Lafferty asked, Green was traveling to and attending her partner's mother's funeral, of which she informed Moog (and was approved for) prior to leaving. During the funeral that Lafferty knew about, Lafferty demanded that the plaintiff attend this ZOOM meeting "or she would be closing the investigation". Ms. Green replied that, again, she was at a family funeral and she could not meet on ZOOM but did not want the matter closed, and asked Lafferty to ask any questions of Green about the incident of which Lafferty was concerned and Green would answer them. Lafferty refused to provide any questions to Ms. Green, and, upon information and belief, Moog, again made no investigation into those allegations and complaints.

62.     Despite the repeated complaints of misogyny, unfair and unequal treatment, harassment and discrimination as described herein, Moog intentionally refused or negligently failed to sufficiently investigate the allegations and/or failed to take prompt and appropriate remedial action to prevent or correct further discrimination and mental anguish to the plaintiff.

63.     Green suffered severe emotional distress as a result of the negligent and intentional acts described above and the ongoing discrimination, harassment, and retaliation that she endured while employed by Moog. As a result of Moog's negligent and intentional acts described herein, Ms. Green suffered loss of sleep, anxiety, panic attacks, depression, and Post Traumatic Stress Disorder symptoms. The Plaintiff began mental health therapy as a result of the acts described herein and was prescribed medication to treat the symptoms and conditions.

## Defendant's Purported Reasons for Ms. Green's Termination are Pretext for Discrimination

64.     Moog's decision to terminate plaintiff's employment was made on the basis of her gender. In the alternative, the Defendant fired Green in retaliation for asserting her constitutional right to be free from non-discrimination in the workplace.

65.     The Defendant's stated reason for termination on April 23rd, 2020 was that Ms. Green's "position was dissolved". Upon information and belief, this statement was false and was a pretext for the actual reason for firing the Plaintiff.

66.     Upon information and belief, Stryffeler intended to give the Sales Operations Manager position to Brandon.

67.     Upon information and belief, Moog, in an effort to cover up their intent to fire the plaintiff, interviewed Ms. Green and downloaded all of her intimate knowledge about the Sales operations at Moog under the ruse of offering Green a role in the so-called "Sales Operations Department". This intentional deception was intended to ensure that Moog was able to gather that information for whomever they hired, which they would lose when the fired the Plaintiff, and these actions would fulfill Moog's discriminatory intent.

68.     The incidents and circumstances alleged herein illustrate the misogynistic and discriminatory culture in the Sales Department and in the hiring practices at Moog, which was allowed to continue, despite proper notice to the Defendant.

69.     In the period after her termination and up to August 1st, Green made multiple requests to management as to what to do with her remaining duties and tasks, Green was given no direction, and thus was forced to leave many "loose ends" when she left.

70.     The duties, tasks, projects and processes that Green created and performed prior to her termination were essential duties, tasks, projects and processes for the Company. Those duties, tasks, processes and projects continued to be essential and necessary functions at Moog after Green's termination.

71.     Upon information and belief, shortly after the plaintiff's last day of employment, the defendant hired an individual or individuals to resume the roles, duties and tasks that the plaintiff held and performed before she was fired.

72.     Upon information and belief, Moog fired Green on the basis of gender. In the alternative, upon information and belief, rather than her job being "dissolved", Ms.

Green was intentionally fired out of retaliation because she continued to assert her legal and constitutional right to be free from discrimination in the workplace, and reported valid claims of discrimination and unfair treatment in the Sales Department to the Defendant, as described herein.

## FIRST CAUSE OF ACTION
### Discrimination on the Basis of Sex in Violation of Title VII (42 U.S.C. U.S.C. 2000e, et. seq.)

73.     The Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

74.     Defendant violated Title VII, Sec. 703 (a)(1) by discriminating against Ms. Green in the terms, conditions and privileges of her employment because of her sex, and subjecting her to disparate treatment in the workplace.

75.     Defendant violated Title VII, Sec. 703 (a)(1) by subjecting Ms. Green to disparate treatment based on her sex, treating her differently than the males in her department, and ultimately terminating her employment because of her sex.

76.     Defendant violated Title VII, Sec. 703 (a)(2) by intentionally limiting Ms. Green's employment opportunities and by ultimately firing her, as described herein, based on her sex.

77.     Moog's actions amount to willful or wanton negligence or recklessness and/or evidence malice an intentional disregard for Plaintiff's statutorily-protected rights.

78.     Plaintiff was damaged as a result of these violations. The Plaintiff is entitled to damages as a result of the Defendant's unlawful acts, including, but not limited to, past and future lost wages and benefits, damages to compensate her for past and

future emotional distress, punitive damages, reasonable attorneys' fees and costs of this action, and pre-judgment interest.

**SECOND CAUSE OF ACTION**
**Violations of Title VII. 42 U.S.C. § 2000e-3(a)**
**Retaliation Against Green for Engaging in Protected Activity**

79.     The plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

80.     The Plaintiff engaged in protected activity when she complained about the discrimination, misogyny, disparate and unequal treatment, and harassment based on gender, as described herein.

81.     In retaliation for Ms. Green' continued complaints of unequal treatment and discrimination in the workplace and in the application of Moog's written Company policy, the Defendant terminated her employment.

82.     There was a causal connection between Ms. Green's multiple complaints and the materially adverse actions taken against Ms. Green by Moog.

83.     The retaliation endured by Ms. Green would dissuade a reasonable employee from making complaints of discrimination and harassment.

84.     Moog retaliated against the plaintiff for engaging in protected activity in violation of Section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a).

85.     The plaintiff was damaged as a result of these actions, as she was fired. The plaintiff also suffered severe emotional distress as a result of the intentional acts described herein. The Plaintiff is entitled to damages as a result of the Defendant's unlawful acts, including, but not limited to, past and future lost wages and benefits,

damages to compensate her for past and future emotional distress, punitive damages, reasonable attorneys' fees and costs of this action, and pre-judgment interest.

**THIRD CAUSE OF ACTION**
**Common Law Breach of Contract**

86.     The Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

87.     The parties entered into an agreement on April 23, 2020, after Ms. Green was fired, in which the Defendant offered a payment of $6,538.48 if Ms. Green would remain employed from that date until August 1st, 2020. If Green chose not to remain working at Moog after being informed that she was fired, she would not be entitled to receive the promised amount.

88.     After Green successfully completed of the employment period mentioned above, the defendant refused to pay the plaintiff the promised two-months' severance.

89.     As a result, the plaintiff has suffered damages in the amount of $6,538.48, and is entitled to be compensated in that amount, plus interest from the date of breach, August 1st, 2020.

**FOURTH CAUSE OF ACTION**
**Negligent Infliction of Emotional Distress**

90.     The Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

91.     Moog failed to properly train Lafferty, Stryffeler, Valente, and others in the areas of Human Resources, which allowed the discrimination, unfair treatment and

physical intimidation described herein to continue, which resulted in damage to the plaintiff.

92.     Additionally, following the incident described in paragraph 33, above, Moog negligently failed to remedy the dangerous situation by failing to create a safe place for Plaintiff by: failing to move or remove Brandon from Plaintiff's immediate physical area, and allowing Brandon to sit directly over Plaintiff's shoulder, four feet away, for a period of at least six months, knowing that Brandon "always carries a knife[5]".

93.     The Defendant's failure to remedy the misogynistic and discriminatory environment and disparate treatment in the Sales Department at Moog proximately caused the Plaintiff severe emotional distress.

94.     As a proximate result, Ms. Green was subject to and endured continued harassment and physical intimidation that caused the plaintiff severe emotional distress as described herein, including but not limited to: anxiety, depression, PTSD symptoms, therapy, and medication for these symptoms.

95.     It was reasonably foreseeable that, if allowed to remain in close proximity in the workplace, Brandon's conduct and demeanor would likely cause the plaintiff severe emotional distress, which it did.

96.     It was reasonably foreseeable that, if the discrimination, disparate and unfair treatment was not remedied, the culture and practices of the Sales Department at Moog would cause the plaintiff severe emotional distress, which it did.

---

[5] This was common knowledge in the Sales Department. Brandon had announced on several occasions that he "always carried a knife".

97.     As a result, the plaintiff seeks damages in excess of $75,000.00.

## FIFTH CAUSE OF ACTION
## Wrongful Discharge

98.     The Plaintiff, realleges and incorporates by reference all allegations in the preceding paragraphs.

99.     As described herein, Moog wrongfully discharged the plaintiff for an unlawful reason and/or a reason that contravenes public policy, such as, *inter alia*, those public policies recited in the Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, et seq., and the North Carolina Equal Employment Practices Act, 49A N.C.G.S. 143-422, et al.

100.    Moog's termination of the plaintiff's job was intended to end the complaints of discrimination and misogyny reported by the plaintiff, and to protect the individual(s) who engaged in the misogynistic, unfair and discriminatory actions described herein.

101.    As a result of the Defendants wrongful acts, the plaintiff was damaged in an amount exceeding $75,000.00, to be proven at trial.

## PRAYER FOR RELIEF

        WHEREFORE, Plaintiff respectfully requests the following relief from this Honorable Court:

A.      An Order Declaring that the acts, practices, and omissions complained of herein are unlawful and violate: Title VII of the Civil Rights Act of 1964, and North Carolina public policy,

B.      An Order enjoining and permanently restraining the Defendant from engaging in the statutory violations herein, and directing that Defendant take such affirmative action as is necessary to ensure that the causes and effects of its unlawful practice are eliminated,

C.      An Order awarding Plaintiff back-pay, front-pay, compensatory damages, and punitive damages in the amount of $100.000.00, for damages suffered by plaintiff as a result of the discrimination, retaliation, and intentional and/or negligent violations of Title VII of The Civil Rights Act, Section 703 (a)(1), 703 (b), et al.,

D.      An Order awarding Plaintiff consequential damages incurred as a proximate result of the breach of contract for employment, in the amount of $6,538.48 plus interest from the date of breach, August 1st, 2020,

E.      An Order awarding the Plaintiff Compensatory Damages in an amount representing back-pay from the date of August 1st, 2020, front-pay, benefits and compensation for emotional distress caused by the wrongful discharge and violations of the various statutes,

F.      An Order directing Defendant to pay compensatory damages that resulted from the Negligent Infliction of Emotional Distress and resulting mental anguish,

G.      An Order directing the Defendant to pay Plaintiff's reasonable attorney's fees and costs, pursuant to the applicable statutes,

H.      That the costs of this action be taxed against the Defendants,

I.      A jury trial on issues of triable fact,

J.      Such other and further relief as the Court shall deem just and proper.

Submitted by and through Plaintiff's attorney, this is the 25th day of May, 2021.

By: s/ Sean D. Soboleski
Sean D. Soboleski
N.C. State Bar No.: 27620
Attorney for Plaintiff, Hannah R. Green
The Law Office of Sean D. Soboleski
33 Coxe Avenue, # 1944
Asheville, North Carolina 28802
Telephone: (828) 515-1545
Email: sean@consumerprotection.legal

# VERIFICATION

I, the undersigned, PLAINTIFF, Hannah R. Green, depose and say that I have read the foregoing AMENDED COMPLAINT and declare that the contents thereof are true of my personal knowledge, and those matters stated on information and belief, I believe them to be true.

Hannah R. Green, Plaintiff

Subscribed to and sworn to before me
This _25th_ day of May, 2021.

Notary Public
My Commission Expires: 9|5|2021